UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT, | § § § § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-11-167 |
| | § | |
| D. H., | § § | |
| Defendant. | § | |

## ORDER GRANTING ATTORNEY'S FEES

Before the Court is "Defendant's Motion for Attorney's Fees and Expenses" (D.E. 24). On April 27, 2012, the Court held an evidentiary hearing on the matter and requested additional briefing. The parties have timely filed their post-hearing briefs (D.E. 35, 36). For the reasons set out below, the Court GRANTS the Defendant's Motion (D.E. 24) and awards a portion of the fees and expenses requested.

## FEES AVAILABLE UNDER THE IDEA

This case was brought as an appeal of the ruling of the Texas Education Agency (TEA) administrative hearing officer pursuant to the Individuals with Disabilities Education Act (IDEA). Defendant, D.H., is a "prevailing party who is the parent of a child with a disability" under the meaning of 20 U.S.C. § 1415(i)(3)(B)(i)(I). This Court is thus entrusted with the discretion to award reasonable attorneys fees as part of the costs of the case assessed against Plaintiff, Corpus Christi Independent School District (CCISD).

As the parties have briefed the issues, two provisions of the IDEA guide the Court's exercise of discretion. First: "Fees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished. No bonus or multiplier may be used in calculating the fees awarded under this subsection." 20 U.S.C. § 1415(i)(3)(C). Second: Attorneys fees may be reduced if "the parent, or the parent's attorney, during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy . . . ." 20 U.S.C. § 1415(i)(3)(F).

## THE EVIDENCE

### A. The Fee Agreements

There are two essentially identical "Representation Agreements" between D.H. and her counsel, Christopher Lee Jonas, for legal services relating to the administrative proceedings and the appeal to this Court, respectively. (Hearing Ex. 1, 2). The language of the Representation Agreements provide, in full:

> I/We, <u>D.H.</u> hereby agree to retain and do retain Christopher Jonas as my/our attorney to represent us in the following matter: *K.M. bnf D.H. v. Corpus Christi ISD.* Christopher Jonas agrees to provide zealous and ethical representation in the above-referenced case. I/We affirm that no other attorney is representing or acting for us in this matter.
>
> I/We understand that Mr. Jonas is not requiring me to pay a retainer. I/We understand that Christopher Jonas bills at the rate of $300.00 per hour for attorney work in this matter. Mr. Jonas will seek reimbursement of attorney's fees from school district. I/We agree to pay expert fees and expenses, directly related to the above-referenced matter. ***Christopher Jonas agrees to utilize best efforts to recover attorney's fees and expenses related to the above-referenced matter from the***

> *school district as permitted by law. I/We agree not to interfere with efforts of Mr. Jonas to collect reimbursement on our behalf from the school district to which we are lawfully entitled*.
>
> I/We agree that Mr. Jonas cannot compromise, settle, dismiss or in any way terminate our case without our oral or written consent. I/We understand that Mr. Jonas is our representative for all purposes in this matter. I/We understand that I/we have the right to discharge Mr. Jonas as our attorney at any time. *I/We understand that under this contract, certain actions on my/our part will constitute constructive termination of Mr. Jonas as our attorney and end Mr. Jonas' obligations to us under this agreement or otherwise. Should I/We attend any ARD meeting, resolution meeting, or other negotiation without prior consultation with Mr. Jonas, or should I/we enter into any agreement with the school district regarding the above-referenced case, without prior consultation with and approval by Mr. Jonas, such action constitutes constructive discharge of Mr. Jonas as our attorney in this matter. Should we elect to discharge Mr. Jonas whether expressly or through the constructive actions specified in the contract, we remain obligated to reimburse attorney's fees and expenses incurred on our behalf by Mr. Jonas under this contract up to the date of discharge, within 30 days of the date of discharge*.
>
> I/We understand that this Representation Agreement is a binding enforceable contract. *I/We understand that I/We will be responsible for any unpaid attorney's fees and costs if I/We fail to adhere to each provision of the Agreement*. I/We understand that Mr. Jonas may withdraw from my/our case for good cause at any time and will take reasonable steps to avoid foreseeable prejudice to my/our rights.

Exhibit 1 (emphasis added).

### B.   The Hourly Rate

D.H.'s expert witness, James Holtz, was a TEA hearing officer for twenty years and, for the last several years has conducted a private practice representing disabled

children and their parents against school districts.  Mr. Holtz testified that a billing rate of $300 is a prevailing rate in the Southern District of Texas for the kind and quality of services furnished.  Transcript, pp. 36-37.  His Expert Report, Exhibit 7, recited $300 per hour at the administrative level and $325 per hour in federal court as reasonable hourly rates.  He further testified that he has seen practitioners charge up to $350 per hour.  Transcript, p. 37.  There was no evidence controverting the reasonableness of the $300 per hour contractual billing rate.

    D.H. testified that she did not have any money to pay Mr. Jonas, whether he billed at $300 per hour or $10 per hour and that he was aware of that fact.  Transcript, p. 13.  Her expectation was that, if she prevailed, CCISD would pay those fees.  Transcript, p. 13.  Furthermore, she would never trigger the constructive discharge clause and incur personal liability because she would never resolve the case without his consent.  Transcript, pp. 13, 15-16, 18, 20.  In that regard, she stated, "I wouldn't do that because my agreement with me [sic] says that I won't do that.  That's why if I didn't want counsel, I wouldn't have signed a representation agreement with him or asked him to represent me."  Transcript, pp. 13-14.

    Without suggesting that any other arrangement would be more appropriate, CCISD questioned any agreement by which someone who is essentially indigent "agrees" to pay $300 per hour for attorney fees.  Mr. Holtz testified that it is common in his practice to represent parties who cannot afford to pay his hourly fee.  Transcript, p. 38.  Whether or not they can afford to pay, he files proceedings to trigger IDEA relief so that, if his clients prevail, his fees can be paid by the school district as costs awarded by the

court pursuant to statute.  Transcript, p. 40.  He considers using the IDEA trigger for attorney's fees to be an important part of properly representing his client whether or not the client can afford to pay.  Transcript, pp. 40-41.  Holtz explained that this IDEA trigger also prompts school districts to make settlement offers that include payment of amounts for attorney's fees.  Transcript, p. 38.

CCISD has challenged the evidence stating that, according to Exhibit 4, Jonas is claiming $350 per hour in contravention of his contract with D.H. in his time submitted for the federal court proceedings.  D.E. 35, p. 5.  The Court has performed the math and finds that the claim for $24,840.00 in fees is accurately calculated as $300 per hour for 82.8 hours of work.

## C.   The Number of Hours

Mr. Jonas' activity logs documenting the hours worked and costs advanced were admitted as Hearing Exhibits 3 and 4.  They reflect a total of $21,330.00 in fees and $450.00 in costs for the administrative proceedings and $24,840.00 in fees and $350.00 in costs for defending the appeal to this Court.  Mr. Holtz did not address the reasonableness of the number of hours documented in the activity logs.  Neither was any other witness offered to controvert the hours expended.  Instead, CCISD challenges the fee claim on the basis that the resolution of the proceedings was "unreasonably protracted," thus rendering an unspecified amount of the attorney's fees unnecessary.

## D.   The Unreasonable Protraction of the Resolution of the Proceedings

CCISD argues that D.H. failed to follow through on a tentative agreement arrived at in the resolution session with CCISD because of her attorney fee agreement, the risk of

incurring actual liability for Mr. Jonas' fees, and Mr. Jonas' contractual control over the resolution.  According to CCISD, this matter could have been resolved and documented two days after the resolution session, thus eliminating the TEA hearing and this appeal and consequent attorney's fees on both sides.  While D.H. and Mr. Jonas denied that Mr. Jonas had any untoward actual or apparent control over the matter that unreasonably protracted the resolution, the contract, itself, along with the evidence offered by CCISD demonstrates that CCISD's position has merit.

In a nutshell, the Representation Agreements provide that D.H. has the benefit of Mr. Jonas' legal work and incurs no obligation for his fees so long as she acts only on his advice and with his consent.  Most troubling is the contract language, "[S]hould I/we enter into any agreement with the school district regarding the above-referenced case, without prior consultation with ***and approval by*** Mr. Jonas, such action constitutes constructive discharge of Mr. Jonas as our attorney in this matter."  Exhibits 1, 2 (emphasis added).  According to the contract, upon constructive discharge, D.H., who did not have the means to pay, would then be liable to pay any fees incurred to date within thirty (30) days.

According to CCISD, D.H. was reluctant to participate in the IDEA resolution session in any meaningful way out of fear of finding herself in breach of the advice and consent provisions of her Representation Agreement.  CCISD offered credible testimony from the school officials who were present regarding D.H.'s actions and demeanor. Evans Elementary School Principal, Arnold Barrera, Jr., testified about his conversations with D.H. in setting up the resolution session.  "Originally she had told me that she did

not have the freedom to make the decision herself.  She had told me that she needed to consult her representation." Transcript, p. 47.

Principal Barrera testified that, when D.H. arrived for the meeting, she stated that "she was told not to agree to anything legally." Transcript, p. 48.  This was corroborated by the CCISD Office of Special Education representative, Jesse William Fincher, III, who testified, "mom wanted to call Mr. Jonas' office and tell them that we did not have a proposal.  And I don't know if she did, but she turned and was on her cell phone. . . . And then she turned around and told us that she was supposed to leave but that she would talk to us for a little while." Transcript, p. 61.

CCISD prevailed upon D.H. to meet and discuss her complaints.  The resolution session was then convened with the principal, Mr. Fincher, the counselor, and the teacher, Mr. Gloria.  They went over D.H.'s due process complaint only to find that D.H. was not really focused on many of the issues it contained.  Transcript, p. 62.  She did want more help for the classroom teacher, but the teacher assured her that the three adults that were already in the classroom were capable of handling the needs of the children.  Transcript, p. 62. Mr. Gloria also went through all of the IEP goals and they discussed some changes that could be made.  Transcript, pp. 62-63.  It appeared that a large measure of D.H.'s concern was in getting in-home training for K.M's increasing behavioral issues, and they discussed how that could come about.  Transcript, p. 63.

After about an hour in CCISD's offices, D.H. had made a tentative agreement on a plan for K.M.'s education:

> In my opinion, she felt comfortable with what we had talked about. She did have reservations on signing anything. She kept referring to that, that she could not—she didn't have the authority to sign or agree to anything unless her attorney approved it. And actually she did not—although verbally she was in agreement, she did not sign anything or agree to anything right there at that meeting. And she was going to take what we had back to the attorney, and she was to come back to us in the next day or so.

Mr. Barrera, Transcript, pp. 52-53. This was corroborated by Mr. Fincher. Transcript, p. 63. When asked whether he had an opinion as to why the case was not resolved at the resolution session, Principal Barrera replied, "Well, it's not an opinion. She told me that her attorney did not allow her to agree to anything." Transcript, p. 53. *See also*, Mr. Fincher, Transcript, p. 64.

The only point of agreement in D.H.'s testimony was that she went to the resolution session and spoke with Principal Barrera and Mr. Fincher. Every other detail is controverted. She denied ever speaking with Principal Barrera to set up the date and time of the resolution session, saying that she was advised of the appointment by her attorney. Transcript, p. 21. D.H. testified that the CCISD representatives were utterly unprepared on her daughter's issues or to work out an agreement. Transcript, p. 10. She complained that Principal Barrera and Mr. Fincher showed up without a proposal or even pen and paper. Transcript, pp. 10, 19.

D.H. denies that any meeting took place with the counselor and the teacher, that they went over the complaint or IEP, or that they arrived at a tentative agreement. Transcript, pp. 20-21. There is no mention of this phase of the meeting in CCISD's Report on Resolution Session, which is part of the Administrative Record. Vol. 1, pp.

63-64. Maintaining that she had full authority to settle on any terms she desired, D.H. denied calling Mr. Jonas at any time around the resolution session and denied being instructed by him to refuse to sign any agreement. Transcript, pp. 9, 19. Mr. Jonas shows three calls from D.H. on October 25, 2010, the date of the resolution session, but the purposes of the calls have been redacted and no time of day information is provided. Exhibit 3, p. 3.

According to Mr. Fincher, he did take notes during the meeting for his personal use and Mr. Gloria was responsible for taking, and did take, notes that were intended to be the basis for transcribing a written agreement. Transcript, pp. 62-63. In response to D.H.'s representation that the CCISD officials did not come to the resolution session with an offer prepared, Principal Barrera testified,

> My responsibility to come to a resolution meeting was to have our plan of action or IEP in place that we have for the student, review that, review the updated goals and objectives as per the teacher, because he's the one that sets those; and have input from different parties to come to a resolution in a plan at the meeting. Not have a previous arrangement to where, once again, we're going to find ourselves where the parent may say I did not have any input or any opportunities to have something in place for my daughter.

Transcript, p. 54. Again, in responding to D.H.'s counsel's question as to why no document reflecting the tentative agreement had been produced, Principal Barrera replied,

> [D.H.] referred to [Mr. Jonas] numerous times that she had to get [his] approval on anything that she would do. And so she was very hesitant to put anything in writing. And because we were supposed to come back after [his] approval, we did not have the final proposal in place. And as I stated earlier, in my

>    opinion as the school principal I did not want to have a proposal ready without input.

Transcript, p. 55.

## DISCUSSION

The IDEA was formulated with procedures that guaranteed opportunities for parent participation. The philosophy is that children will be best protected if their parents can be heard as their champions. "[P]arents and guardians will not lack ardor in seeking to ensure that handicapped children receive all of the benefits to which they are entitled by the Act." *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 209, 102 S.Ct. 3034, 3052 (1982). Inclusion of the parent is considered an important factor in developing appropriate plans that are reasonably calculated to provide a meaningful educational benefit. In this regard, IDEA is set up so that "the services are provided in a coordinated and collaborative manner by the key 'stakeholders.' " *Adam J. v. Keller Independent School District*, 328 F.3d 804, 810 (5th Cir. 2003). There are extensive provisions for ensuring that parents have notice and an opportunity to be heard in IDEA-related proceedings at the school district. *E.g.*, 20 U.S.C. § 1415(b)(1), (c).

It is equally true that the IDEA recognizes the need for parents of disabled children to have legal representation, even if they cannot afford it, to ensure that their children's rights under the statute are enforced. Otherwise, there would be no need to include a manner of taxing the prevailing parent's attorney's fees as costs against the school district. *See* 20 U.S.C. § 1415(h)(1), (i)(3).

While access to legal services is important for all concerned, the IDEA is structured with recognition that attorney involvement can skew the playing field. Thus, the provisions regarding the resolution session only permit the school district to bring a lawyer if the parent brings a lawyer. 20 U.S.C. § 1415(f)(1)(B)(i)(III). According to the IDEA, the resolution session is "where the *parents* of the child discuss their complaint, and the facts that form the basis of the complaint, and the local educational agency is provided the opportunity to resolve the complaint." 20 U.S.C. § 1415(f)(1)(B)(i)(IV) (emphasis added). If a parent is accompanied by her attorney at the resolution session, there is room for disagreement over whether the lawyer's involvement will enhance or detract from the parent's participation on behalf of her child. However, there is little question that a parent's participation is chilled if she appears without her attorney, but still cannot act without her attorney's approval.

The Court is convinced that D.H. was, at all times, cognizant of her contractual obligations to her attorney, Mr. Jonas, with respect to his fees. While clearly appreciative and respectful of his skills, she had no means by which to pay him a fee or reimburse his costs. At the same time, she had no desire to interfere with his ability to recover his fees and costs from CCISD and was contractually precluded from doing so. Thus she was acutely aware that, contractually, if she failed to obtain his approval before resolving her complaint, she could eliminate his only means for payment. This contractual scenario essentially immobilized her, as she was concerned about even the appearance of entering into an agreement.

Courts condemn arrangements, referred to as "champerty and maintenance," by which an otherwise disinterested person takes control of another's litigation. *E.g.*, *Martin v. Morgan Drive Away, Inc.*, 665 F.2d 598, 603 (5th Cir.), *cert. dismissed sub nom.*, *Morgan Drive Away, Inc. v. Samford*, 458 U.S. 1122, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982). Likewise, "Clauses in a contract between attorney and client which prohibit a settlement by the client without his attorney's consent are generally held to be unenforceable as against public policy." *Lewis v. S. S. Baune*, 534 F.2d 1115, 1122 (5th Cir. 1976). *See also*, TEX. DISCIPLINARY R. PROF'L CONDUCT 1.02(a)(2), comment 5.

The contract raises another important concern with respect to binding the client "not to interfere" with the attorney's claim for attorney's fee reimbursement against the school district. At best, this clause creates the appearance of bias, justifying a substantial discounting of the credibility of the client's testimony in favor of her attorney's work. *See generally, In re Topcor Inc.*, 54 Fed. App'x. 405 n.10, 2002 WL 31688702, *4 (5th Cir. 2002). Because interference with the fee reimbursement process could render D.H. personally responsible for a fee she could not pay, the contract interferes with what is potentially the best evidence of whether fees charged were necessary and reasonable. In other words, the contract neutralizes the attorney's most effective critic on any issue that touches upon the reasonableness or necessity of the attorney's claim for fees and expenses.

CCISD argues that the fee agreement is unconscionable and unenforceable. The IDEA does not require the Court to so hold. The Court finds that the fee agreement was calculated to, and did in fact, cause the resolution of the proceedings to be "unreasonably

protracted" within the meaning of 20 U.S.C. § 1415(i)(3)(F). Under that section, then, the Court must determine to what extent the protraction contributed to excessive hours expended.

This issue cannot be viewed in a vacuum. CCISD complains that the contract had the effect of derailing a settlement that would have been completed through the resolution session. But at the same time, CCISD's own evidence would indicate that there was not such a meeting of the minds that settlement was imminent, making all subsequent legal proceedings nothing more than protraction. For instance, CCISD claims that D.H. was mostly interested in in-home training. Yet, the settlement offer CCISD later communicated to D.H. made no mention of that issue. D.E. 28-2. Moreover, CCISD defended the substantive claims through its own appeal to this Court.

Because the federal court proceedings were initiated by CCISD and involved an appeal of issues related to the merits and not just attorney's fees, the Court will not reduce the claim of $25,190 for D.H.'s counsel's work on that phase of the case. With respect to the administrative phase of the proceedings for which D.H. claims $21,780, the Court finds that D.H.'s conduct at the resolution session indicates that the fee agreement and the requirement that counsel approve any settlement caused the shifting of focus away from an efficient resolution of K.M.'s educational needs. Consequently, the Court reduces D.H.'s attorney fee request pursuant to 20 U.S.C. § 1415(i)(3)(F) as follows: (1) with respect to the attorney's 11.4 hours logged prior to the resolution session, the time will be reduced by one-half, for a reduction of $1,710; (2) with respect to the attorney's 4.6 hours logged between the resolution session and CCISD's formal offer of settlement,

the time is reduced in full, for a reduction of $1,380. The total reductions of the attorney's requested fee is thus $3,090.

## CONCLUSION

For the reasons set out above, Defendant's Motion for Attorney's Fees (D.E. 24) is GRANTED. Defendant, D.H., shall recover from Plaintiff, CCISD, the sum of $43,880.00, to be taxed as costs in this case.

ORDERED this 7th day of June, 2012.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE